## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CHELSEA R. SLAGLE,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:21cv00009 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **KILOLO KIJAKAZI,**[1] | ) | |
| **Acting Commissioner of** | ) | By: PAMELA MEADE SARGENT |
| **Social Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, Chelsea R. Slagle, ("Slagle"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that she was not eligible for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 1381 *et seq*. Jurisdiction of this court is pursuant to 42 U.S.C. 1383(c)(3). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi is, therefore, substituted for Andrew Saul as the defendant in this case.

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Slagle protectively filed her application for SSI[2] on December 12, 2016, alleging disability as of August 19, 2011, based on attention deficit hyperactivity disorder, ("ADHD"); bipolar disorder; oppositional defiant disorder; asthma; diabetes; anxiety; comprehension problems; plantar fasciitis; depression; rheumatoid arthritis; muscle and joint disorder; kidney problems; ovarian cysts; stomach problems; learning problems; and back pain. (Record, ("R."), at 17, 364-65, 393, 423.) The claim was denied initially and on reconsideration. (R. at 234-54.) Slagle requested a hearing before an administrative law judge, ("ALJ"). (R. at 17.) A hearing was held on November 13, 2018, at which Slagle was represented by counsel. (R. at 83-114.)

By decision dated January 14, 2019, the ALJ denied Slagle's claim. (R. at 195-213.) Slagle pursued her administrative appeals, (R. at 309-12), and the Appeals Council remanded her claim for evaluation of her obesity. (R. at 225-26.) The

---

[2] Slagle received SSI disability as a child and by decision dated August 18, 2011, it was determined that she was no longer disabled as of March 1, 2009. (R. at 118-28.) On October 25, 2012, Slagle filed an application for SSI alleging disability as of August 18, 2011. (R. at 133.) By decision dated January 25, 2016, the ALJ denied Slagle's claim. (R. at 133-47.) Slagle pursued her administrative appeals, but the Appeals Council denied her request for review. (R. at 156-60.)

Pursuant to the Fourth Circuit's opinion in *Albright v. Comm'r of Soc. Sec. Admin.,* 174 F.3d 473 (4th Cir. 1999), and in accordance with Social Security Acquiescence Ruling, ("AR"), 00-1(4), "[w]hen adjudicating a subsequent disability claim arising under the same…title of the Act as the prior claim, an adjudicator determining whether a claimant is disabled during a previously unadjudicated period must consider such a prior finding as evidence" and consider its persuasiveness in light of all relevant facts and circumstances. A.R. 00-1(4), 65 Fed. Reg. 1936-01, at *1938, 2000 WL 17162 (Jan. 12, 2000). The ALJ in this case noted he reviewed the previous 2011 and 2016 decisions. (R. at 34.) The ALJ noted he gave "some weight" to these decisions, and based on the current record, Slagle required some "differing limitations" as noted in his decision. (R. at 34.)

Appeals Council noted Slagle had a body mass index, ("BMI"), of 52 and she was five feet tall and weighed 270 pounds. (R. at 225.) Upon remand, the ALJ was to consider the nature, severity and limiting effect of obesity as required by Social Security Ruling. ("S.S.R."), 19-2p, and further consider Slagle's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations. (R. at 225.) In addition, if warranted, the ALJ should obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Slagle's occupational base. (R. at 226.) Therefore, a supplemental hearing was held on July 21, 2020, at which Slagle was represented by counsel.[3] (R. at 50-81.)

By decision dated August 10, 2020, the ALJ denied Slagle's claim. (R. at 17-37.) The ALJ found Slagle had not engaged in substantial gainful activity since December 12, 2016, the application date. (R. at 19.) The ALJ determined Slagle had severe impairments, namely, bipolar disorder; panic disorder; ADHD; obesity; degenerative disc disease; and residuals of lumbar and pelvic fractures, but he found Slagle did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-20.)

The ALJ found Slagle had the residual functional capacity to perform simple, routine and repetitive light[4] work, except she could lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; stand, walk and sit up to six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions;

---

[3] The hearing transcript erroneously lists the date of the hearing as July 21, 2010.

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 416.967(b) (2021).

occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders ropes or scaffolds; and never work around unprotected heights, hazards and vibration. (R. at 23.) The ALJ also found Slagle was limited to making simple work-related decisions; she could occasionally tolerate workplace changes for two-hour increments; she could occasionally interact with supervisors and co-workers; and she could never interact with the public. (R. at 23.) The ALJ found Slagle had no past relevant work. (R. at 35.) Based on Slagle's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Slagle could perform, including the jobs of a router, a marker and a housekeeping/cleaner. (R. at 35-36, 73-74.) Thus, the ALJ concluded Slagle was not under a disability as defined by the Act and was not eligible for SSI benefits. (R. at 36-37.) *See* 20 C.F.R. § 416.920(g) (2021).

After the ALJ issued his decision, Slagle pursued her administrative appeals, (R. at 357-60), but the Appeals Council denied her request for review. (R. at 1-5.) Slagle then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2021). This case is before this court on Slagle's motion for summary judgment filed August 17, 2021, and the Commissioner's motion for summary judgment filed September 16, 2021.

*II. Facts*

Slagle was born in 1990, (R. at 35), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c).  She was enrolled in special education classes while in high school, but she could read and write. (R. at 35, 72, 394.) Slagle reported she had specialized training in culinary arts. (R. at 394.) Slagle testified she was five feet tall and weighed 276 pounds. (R. at 60.)  She stated her back and knee pain, as well

as her weight, prevented her from stooping, bending, squatting and kneeling. (R. at 64.) She stated she could not bend at the waist and reach the floor to pick things up off the floor. (R. at 64.) Slagle stated she was diagnosed with asthma[5] at a young age, and had been using a nebulizer daily until it got broken. (R. at 67.) Slagle stated certain activities restricted her breathing, such as bending over, walking, sitting, rising from a seated position and changing positions. (R. at 67-68.) She also testified that her symptoms were intermittent and stated she had not sought emergency treatment for her symptoms. (R. at 99-100.)

In rendering his decision, the ALJ reviewed records from Leslie E. Montgomery, a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. James Darden, M.D., a state agency physician; Norton Community Hospital; Community Physicians Norwise; Appalachia Family Health; Lonesome Pine Hospital; Dr. Uzma Ehtesham, M.D., a psychiatrist; Lenowisco Health Department; Arthur W. Stair, III, M.A., a licensed senior psychological examiner; Holston Valley Medical Center, ("Holston Valley"); Dr. R. Michael Moore, M.D.; William A. Davis Clinic; Western Lee Clinic; Dr. Lindsay Remy, M.D.; Family Preservation of Virginia; and Wellmont Medical Associates.

From 2016 through 2020 Slagle saw Crystal Burke, L.C.S.W., a licensed clinical social worker with Appalachia Family Health, and reported insomnia; irritability; mood swings; difficulty concentrating; daily panic attacks; and difficulty completing tasks. Slagle reported medications improved her mood and helped her to stay focused; (R. at 1789, 1792, 1802, 1820, 2075); yet she reported she would forget

---

[5] The record shows Slagle was diagnosed with chronic asthma and prescribed an inhaler. (R. at 1662, 2211, 2535.) However, Slagle routinely denied cough, wheezing and shortness of breath. (R. at 2211, 2544, 2548, 2552, 2597, 2603.) Her pulse oxygen level was 97 to 98 percent, and her examinations showed normal breathing effort and breath sounds, she was in no respiratory distress, and she had no wheezes or rales. (R. at 2212, 2598, 2604.)

to take her medications due to stressors, such as relationship and family stressors. (R. at 1820, 1824.) During this time, Slagle's examination findings revealed her mood was depressed, anxious, euthymic and/or irritable with a congruent, flat and lethargic affect; she had adequate eye contact; her thought process was intact but blocking at times; her insight and judgment were good to fair; her thoughts were clear and logical; she was goal oriented; she was fully oriented; she exhibited no paranoia or delusions; and she had no suicidal or homicidal ideations. (R. at 1790-92, 1794-95, 1797, 1801-02, 1804, 1807, 1814, 1819, 1822, 1826, 2000-01, 2013, 2034, 2051, 2067-68, 2078-79, 2099-2100, 2106-07, 2112, 2139-40.)

In November 2016, Burke discussed anger management as Slagle reported several issues with becoming easily frustrated and angry. (R. at 1808.) Slagle reported performing various activities, including taking care of her grandparents; running various errands; attending a concert, which she stated caused anxiety; spending time with her cousins; getting engaged; and working part-time on a paper route.[6] (R. at 2030, 2064, 2075, 2102, 2108, 2114.) In March 2017, Slagle reported she had been "too busy" helping with her mother and grandmother to secure another psychiatrist.[7] (R. at 2010.) She reported she was upset over breaking up with her boyfriend, but instead of being destructive or cutting herself, she got a piercing. (R. at 2010.)  In January 2018, Slagle reported Lithium helped with mood stability, but she had some problems with mood regulation. (R. at 2114.) In March 2018, Slagle reported she got married and she stopped taking her Lithium because she was trying to conceive. (R. at 2134.) In December 2018, Slagle reported her moods were stable, but she had difficulty coping with stress. (R. at 2649.) She reported several stressors,

---

[6] In April 2018, Slagle reported she had stopped working the paper route because "it got to be too much for her." (R. at 2352.)

[7] Due to a disagreement in treatment, Slagle no longer sought treatment from Ava Martin, a professional mental health nurse. (R. at 1828.)

including her recent motor vehicle accident, lack of transportation, housing issues, financial stressors and her husband being unemployed. (R. at 2649.)

From February 2016 through November 2016, Ava Martin, PMHNP-BC, a board-certified professional mental health nurse practitioner at Appalachia Family Health, treated Slagle for ADHD; insomnia; bipolar disorder; and panic disorder without agoraphobia. During this time, Slagle reported she experienced panic attacks and she was unable to stay focused. (R. at 1708, 1728, 1733, 1744, 1749, 1761.) She also reported that her depression and moods were better when she remembered to take her medication, and Martin re-educated her on the importance of medication compliance. (R. at 1710, 1733, 1739, 1744, 1749, 1753.) Slagle's mood was euthymic with a congruent affect; her eye contact was appropriate; she was fully oriented; her thought process was intact; she exhibited no paranoia or delusions; her judgment and insight were fair; she was calm and cooperative; her motor movements were unremarkable; her speech was normal; she had average intellect; and she had no suicidal or homicidal thoughts. (R. at 1711, 1724, 1729, 1734, 1739, 1744, 1754, 1764.) Slagle's weight ranged from 258 to 276 pounds and her BMI ranged from 50.39 to 53.9. (R. at 1710, 1723, 1728, 1733, 1738, 1743, 1748, 1753.)

On May 25, 2016, Slagle presented to the emergency department at Lonesome Pine Hospital for upper respiratory symptoms. (R. at 1915-18.) Upon examination, Slagle had normal breathing sounds and effort, with no wheezes; she had normal range of motion; she was alert and fully oriented; and she was mildly anxious. (R. at 1917.) She was diagnosed with acute bronchitis, unspecified. (R. at 1918.)

From June 2016 through December 2017, Dr. Esther Ajjarapu, M.D., a physician at Appalachia Family Health, saw Slagle for diabetes, asthma,[8] back and joint pain, mood swings, stress and allergy symptoms. (R. at 1660, 1665, 2016, 2053, 2080.) Slagle stated ibuprofen and muscle relaxers helped her back pain. (R. at 1660.) Slagle was in no acute distress; her breathing was effortless and normal, auscultation of the lungs revealed clear breath sounds, bilaterally, and breath sounds were normal in volume; her gait was normal; her motor examination revealed normal tone, bulk and strength; she had appropriate judgment and good insight; she was fully oriented; her recent and remote memory were intact; her mood was euthymic; and her affect was appropriate. (R. at 1662, 1667.) Slagle's weight ranged from 266 to 277 pounds and her BMI ranged from 51.95 to 54.25. (R. at 1662, 1667, 2021, 2062, 2086, 2095.) Dr. Ajjarapu diagnosed type 2 diabetes mellitus without complications; mild intermittent asthma, uncomplicated; low back pain; polycystic ovarian syndrome; and amenorrhea, unspecified. (R. at 1662.) She prescribed medication for Slagle's asthma and diabetes and advised her to continue using over-the-counter medication for her back pain. (R. at 1662.) Dr. Ajjarapu ordered a pulmonary function test.[9] (R. at 1662.)

From October 2016 through May 2017, Slagle saw Rebecca Mullins, F.N.P., a family nurse practitioner at Appalachia Family Health, who diagnosed nicotine dependence, unspecified; acute sinusitis; radiculopathy, lumbar region; gastroesophageal reflux disease, ("GERD"), without esophagitis; and anxiety disorder. (R. at 1674, 1678.) Slagle's examination findings showed she was in no acute distress; her breathing was effortless and normal, auscultation of the lungs revealed clear breath sounds, bilaterally, and breath sounds were normal in volume;

---

[8] In June 2016, Slagle stated she no longer had Medicaid and she could not afford her inhaler. (R. at 1660.)

[9] The record does not contain evidence that this test was performed.

her gait was normal; her lumbar spine had tenderness but normal lordosis and normal range of motion; and she was fully oriented. (R. at 1674, 1678.) In May 2017, Slagle complained of left shoulder and back pain. (R. at 2023.) Slagle's examination findings remained unchanged except she had slight tenderness in the lumbar spine; her left shoulder had limited range of motion and exhibited pain; and she was unable to put her hand behind her back. (R. at 2027.) During this time, Slagle's weight ranged from 270 to 271.5 pounds and her BMI ranged from 52.73 to 53.02. (R. at 1674, 1758.)

On February 6, 2017, Slagle presented to the emergency department at Lonesome Pine Hospital for complaints of chest pain. (R. at 1840-56, 1866-71.) Chest x-rays showed no abnormality, but quality of visualization was poor due to body habitus. (R. at 1841.) Upon examination, Slagle had normal breathing sounds and effort, with no wheezes; her chest had mild tenderness over the sternum and left anterior chest; she had normal range of motion; she was alert and fully oriented; and she was mildly anxious. (R. at 1868.) She was diagnosed with acute bronchitis. (R. at 1870.)

On February 23, 2017, Leslie E. Montgomery, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Slagle's depressive, bipolar and related disorders; anxiety and obsessive-compulsive disorders; and neurodevelopmental disorders were severe. (R. at 168-69.) She opined Slagle had mild limitations in her ability to understand, remember or apply information, to concentrate, persist or maintain pace and to adapt or manage herself; and moderate limitations in her ability to interact with others. (R. at 169.) On July 5, 2017, Howard S. Leizer, Ph.D., a state agency psychologist, completed a PRTF, which mirrored that of Montgomery from February 23, 2017. (R. at 183-84.)

That same day, Montgomery completed a mental assessment, finding Slagle had moderate[10] limitations in her ability to understand, remember and carry out detailed instructions; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 171-72.) Montgomery stated Slagle's work-related mental abilities were, otherwise, not significantly limited. (R. at 171-72.) Montgomery opined Slagle could perform simple and unskilled work. (R. at 172.) On July 5, 2017, Leizer completed a mental assessment, which mirrored Montgomery's findings. (R. at 186-88.)

On February 27, 2017, Dr. James Darden, M.D., a state agency physician, stated the record showed Slagle was treated for diabetes, GERD, low back pain and allergies, but she had no hospitalizations or exacerbations for these impairments, and they did not interfere with her activities of daily living. (R. at 167-68.) Therefore, he found Slagle's impairments were not severe. (R. at 168.)

From April 2017 through July 2018, Slagle saw Dr. Uzma Ehtesham, M.D., a psychiatrist, on three occasions,[11] and was diagnosed with bipolar I disorder, most recent episode, mixed, moderate; and generalized anxiety disorder. (R. at 1898, 2455.) She had a normal gait; her hygiene and grooming were fair; she had

---

[10] The regulations define "moderate limitations" as an individual's ability to function independently, appropriately, effectively and on a sustained basis as fair. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(c) (2021).

[11] Slagle was seen on April 26, 2017; June 5, 2018; and July 5, 2018. (R. at 1897, 2451, 2454.)

intermittent eye contact; her motor activity was normal; her affect was anxious; her mood and thought content were congruent; her insight and judgment were fair; her reality testing was intact; and her thought process was goal oriented. (R. at 1897-98, 2452, 2454-55.)

On September 17, 2017, Slagle presented to the emergency department at Norton Community Hospital for complaints of chest pain. (R. at 1902.) Chest x-rays showed spinal scoliosis but no acute thoracic process. (R. at 1900.) She was diagnosed with chest pain. (R. at 1905.) Differential diagnoses of acute myocardial infarction, angina and chest wall pain was noted. (R. at 1905.)

From April to October 2018, Slagle saw Katie Barnett, L.C.S.W., a licensed clinical social worker at William A. Davis Clinic, for individual counseling to address depression, anxiety and attention concerns. In July 2018, Slagle reported thoughts of "cutting" herself when she became angry, but she had not acted on them. (R. at 2365.) She stated suicidal ideations were triggered by home conflicts. (R. at 2365.) Slagle reported she was prescribed Latuda, and she was doing better. (R. at 2369.) In August 2018, Slagle reported nightmares, increased panic and anxiety. (R. at 2385.) She stated she had not been sleeping well, she had difficulty with concentration and memory, and she had been "zoning out." (R. at 2385.) In September 2018, Slagle reported she was training a service dog hoping that it would be able to retrieve things for her since she had difficulty bending and reaching for things. (R. at 2412.) She reported impulsive behaviors and irritability. (R. at 2412.) During this time, Slagle was well-groomed; she had an anxious mood and congruent affect; her eye contact, speech, judgment and insight were normal; she was fully oriented; she exhibited no hallucinations, delusions or paranoia; and she had passive suicidal ideations, but no plan or intent. (R. at 2353-54, 2357-58, 2361-62, 2365-66, 2369-70, 2386, 2466.)

From June 2018 through September 2019, Dr. R. Michael Moore, M.D., saw Slagle and diagnosed severe bipolar disorder; unspecified asthma, uncomplicated; kidney stone; low back pain; intervertebral disc degeneration, lumbar region; morbid obesity; polycystic ovarian syndrome; migraine without aura, not intractable; closed fracture of left pubis; PTSD; and hyperlipidemia. (R. at 2533.) Slagle's examinations were normal except her musculoskeletal examination showed decreased range of motion with flexion and extension and she had bilateral low back tenderness, muscle spasm with decreased range of motion. (R. at 2212, 2215, 2439-40, 2532-33, 2536-37, 2540-41, 2544-45, 2548-49, 2552-23.) During this time, Slagle's weight ranged from 212 to 270 pounds and her BMI ranged from 41.4 to 52.7. (R. at 2212, 2215, 2439, 2532, 2536, 2540, 2544, 2552, 2548.)

On July 16, 2018, Slagle was admitted to Clearview Psychiatric Center for depression and anxiety, which she related to living with her mother-in-law. (R. at 2418-30.) When discharged on July 20, 2018, Slagle was alert and oriented; she was cooperative; her speech was normal; her mood was euthymic with a full affect; her thought processes were goal directed and linear; her thought content showed no suicidal or homicidal ideations, delusions or hallucinations; and her insight and judgment were good. (R. at 2419.)

On July 25, 2018, Slagle saw Emily C. Steffey-Stacy, PMHNP, a professional mental health nurse practitioner at William A. Davis Clinic, and reported she was stable on her current medication regimen. (R. at 2373.) Slagle was in no acute distress; her motor examination revealed normal tone, bulk and strength; her gait was normal; her speech was normal; her thought process was intact; she had appropriate judgment and good insight; she was fully oriented; her recent and remote memory were intact; her attention and concentration were good; and she denied suicidal and homicidal ideations and hallucinations. (R. at 2379-80.) On August 22,

2018, Slagle complained of shortness of breath on exertion and when lying down. (R. at 2389.) Her examination findings remained unchanged. (R. at 2395-96.)

On August 30, 2018, Slagle presented to the emergency department at Lonesome Pine Hospital for complaints of left arm pain. (R. at 2431-35.) She reported she was changing a tire and felt something pop in her left forearm/elbow. (R. at 2431.) Slagle's examination findings were normal except she had tenderness in her left elbow and forearm. (R. at 2433.) She was diagnosed with lateral epicondylitis of the left elbow. (R. at 2435.)

On September 5, 2018, Barnett completed a mental assessment, finding Slagle had serious limitations in her ability to deal with the public; to interact with supervisors; to deal with work stresses; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 2347-49.) Otherwise, she opined Slagle had no or satisfactory limitations in all other areas. (R. at 2357-49.) Barnett found Slagle would be absent from work more than two days a month. (R. at 2349.)

On October 26, 2018, Arthur W. Stair, III, M.A., a licensed senior psychological examiner, evaluated Slagle at the request of her attorney. (R. at 2458-64.) Slagle had good hygiene and grooming; her balance, gait and posture were normal; she was a good historian but was somewhat disorganized in her thinking; she was cooperative; she had difficulty maintaining comfort during the evaluation as she constantly shifted in her chair and arched her back to stretch; she was fully oriented; her thoughts were scattered, and she had difficulty staying on task; she made good eye contact;  she struggled on the serial 7s task, as she was anxious; she exhibited no memory problems; she demonstrated a below average degree of higher executive functioning; her intellectual functioning was in the upper end of borderline

intellectual functioning range; she had a dysphoric affect and was overtly anxious; she had a fair attention span; and her speech was normal. (R. at 2458, 2460.)

The Personality Assessment Inventory, ("PAI"), test was administered, which indicated Slagle was moderately to severely depressed, anxious and agitated and had difficulty establishing and maintaining social relationships. (R. at 2463.) Stair diagnosed bipolar I disorder, most recent episode depressed, moderate to severe; generalized anxiety disorder with panic features, moderate to severe; ADHD; borderline personality disorder; and a learning disability, not otherwise specified. (R. at 2463.) Stair opined Slagle's ability to understand simple information or directions was moderately impaired; her abilities to comprehend and implement multi-step complex instructions, to maintain persistence and concentration, to adapt to changes in the workplace and to interact socially were markedly impaired. (R. at 2463.)

On October 30, 2018, Dr. Moore completed medical assessment, finding Slagle could occasionally lift and carry items weighing five pounds and two pounds frequently; she could stand and/or walk up to two hours in an eight-hour workday and could do so for 15 minutes without interruption; she could sit up to three hours in an eight-hour workday and could do so for 30 minutes without interruption; she could never climb, stoop, kneel, balance, crouch or crawl; she had a limited ability to reach and to handle; she was restricted from working around heights, moving machinery, humidity and vibration; and she would be absent from work more than two days a month. (R. at 2443-45.)

That same day, Dr. Moore completed a mental assessment, finding Slagle had moderate limitations, resulting in a satisfactory ability to function independently and to maintain personal appearance. (R. at 2447-49.) Otherwise, he found Slagle had a

seriously limited to no ability to perform occupational, performance and personal/social adjustments. (R. at 2447-48.) He opined she would be absent from work more than two days a month. (R. at 2449.)

On November 1, 2018, Stair completed a mental assessment, indicating Slagle had moderate limitations, resulting in a satisfactory ability to follow work rules and to maintain personal appearance. (R. at 2470-72.) Otherwise, he found Slagle had a seriously limited to no ability to perform occupational, performance and personal/social adjustments. (R. at 2470-71.) Stair opined Slagle would be absent from work more than two days a month. (R. at 2472.)

From January 2019 to June 2020, Slagle saw Burke for complaints of stress, mood swings, desire to self-harm, anxiety and trauma-related symptoms resulting from a motor vehicle accident,[12] which included flashbacks, panic attacks, hypervigilance and nightmares. (R. at 2643, 2649, 2654, 2666, 2678, 2690, 2740, 2746, 2760 2766.) In January 2019, Slagle reported she wanted to self-harm by cutting herself, but her mother and husband removed all knives from the house. (R. at 2643.) In February 2019, Slagle reported she cut her left wrist with her fingernail due to difficulty dealing with stress. (R. at 2654.) In March 2019, Slagle reported she received second degree burns to her left hand while preparing a meal. (R. at 2666.) She stated this made her angry and she punched the cabinet fracturing her

---

[12] On March 19, 2019, Slagle was air transported to Holston Valley Medical Center following a motor vehicle accident. (R. at 2474-2530.) X-rays of Slagle's right ankle showed a soft tissue injury to the heel. (R. at 2479.) A CT scan of Slagle's chest and lumbar spine showed a minimal displaced fracture involving the left pubic body with partial extension into the superior and inferior pubic rami; adjacent soft tissue swelling; and a minimally displaced fracture of the left L4 transverse process. (R. at 2479-81.) A CT of Slagle's cervical spine showed no acute intracranial abnormality or injury. (R. at 2480.) X-rays of Slagle's chest and right shoulder were normal. (R. at 2482.) Slagle was diagnosed with closed fracture of multiple pubic rami, right. (R. at 2497.)

right hand.[13] (R. at 2666.) In July and September 2019, Slagle reported she planned to take classes to become a personal caretaker for her grandmother, and in October 2019, she reported the class was a "failure." (R. at 2696, 2703, 2709.) She stated she was too overwhelmed and had to withdraw after attending one day. (R. at 2709.) Slagle reported she started cutting herself and she was not sleeping. (R. at 2709.) In November 2019, Slagle reported she got a job at Hardee's, and she was very anxious about it. (R. at 2722.) In December 2019, Slagle reported she quit her job at Hardee's due to back pain. (R. at 2728.) During this time, Slagle presented in pajama pants; her mood and affect were dysphoric; she had adequate eye contact; she was fully oriented; she exhibited no paranoia or delusions; and she had no suicidal or homicidal ideations. (R. at 2712-13, 2719-20, 2725-26, 2731-32, 2737-38. 2743-44, 2749-50, 2763-64, 2769-70.)

In April and May 2019, Dr. Lindsay Remy, M.D., saw Slagle for follow up of her pubic rami fractures. (R. at 2556-59.) In April 2019, Slagle reported right shoulder pain. (R. at 2558.) Slagle's right shoulder had full range of motion, but it was hesitant in forward elevation and exhibited painful resisted flexion (R. at 2558.) In May 2019, Slagle reported doing well, she had minimal pain and she was no longer walking with an assistive device. (R. at 2556.) Slagle had tenderness to palpation around the L4 left-sided transverse process, paraspinal muscles; she had pain free right hip range of motion; and she had mild pubic discomfort during left hip range of motion, but only at extremes. (R. at 2556.)

---

[13] On March 10, 2019, Slagle presented to the emergency department at Norton Community Hospital for an injury to her right hand after punching a cabinet. (R. at 2634-42.) X-rays of Slagle's right hand were suggestive of subluxation at the third metacarpophalangeal, ("MCP"), joint, which was only supported on lateral view. (R. at 2634.) She was diagnosed with right hand sprain. (R. at 2636.)

From July 2019 through February 2020, Slagle was seen at Family Preservation of Virginia for bipolar disorder and PTSD. (R. at 2576-92.) Slagle was overweight, unkempt and cooperative; she made good eye contact; her thought process ranged from normal to conversational and slow; she had partial to full insight and good judgment; she exhibited no to moderate functional impairment; she had good impulse control; she was fully oriented; her attention and concentration were adequate; she had no memory impairment; she had a normal gait and posture; and her mood was calm, anxious and depressed with an appropriate to flattened affect. (R. at 2577, 2580, 2586, 2589, 2592.)

From October 2019 through July 2020, Slagle saw Dr. Lauren B. Burns, D.O., a physician with Wellmont Medical Associates, for various complaints, including left hip pain, cough, chest congestion,[14] hyperlipidemia, back and leg pain, breathing problems, anxiety, GERD and kidney stones. (R. at 2595, 2601, 2611, 2617, 2808, 2812.) During this time, Slagle was in no distress; her cardiovascular and pulmonary examinations were normal; her extremities had normal range of motion, no edema, tenderness or deformity; she was fully oriented; she had decreased range of motion and pain in the lumbar back; and her mood, affect, behavior, judgment and thought content were normal.[15] (R. at 2598, 2604, 2614-15, 2621, 2809, 2815-16.) In January 2020, x-rays of Slagle's left hip were normal, and Dr. Burns prescribed conservative treatment of over-the-counter analgesics (R. at 2607.) Dr. Burns diagnosed chronic bilateral low back pain with bilateral sciatica; apnea;[16] malaise and fatigue; bipolar

---

[14] On January 28, 2020, Slagle complained of cough and chest congestion. (R. at 2611.) Her pulmonary examination was normal, and she was diagnosed with the flu. (R. at 2614-15.)

[15] In January 2020, Slagle's mood was anxious and depressed. (R. at 2604.)

[16] In July 2020, Slagle stated she had been using an automatic positive airway pressure, ("APAP"), machine but she had not noticed any change. (R. at 2812.)

I disorder; nonseasonal allergic rhinitis due to pollen; and GERD without esophagitis. (R. at 2622, 2809.)

On November 15, 2019, Slagle presented to the emergency department at Norton Community Hospital for complaints of back pain and bilateral shoulder pain that radiated into her feet. (R. at 2626-33.) She was diagnosed with exacerbation of chronic pain. (R. at 2632.)

On May 5, 2020, an MRI of Slagle's lumbar spine showed mild to moderate bilateral foraminal narrowing due to bulging annulus and facet arthropathy at the L4-L5 level, right more than left and resolution of the cystic lesions of both ovaries. (R. at 2752-53.)

On June 8, 2020, Dr. Burns completed a mental assessment, finding Slagle had no limitations in her ability to follow work rules; to use judgment in public; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; and to maintain personal appearance. (R. at 2754-56.) She found Slagle was slightly limited in her ability to relate to co-workers; to understand, remember and carry out detailed job instructions; and to demonstrate reliability. (R. at 2754-55.) Dr. Burns opined Slagle had moderate limitations, resulting in a satisfactory ability to relate predictably in social situations. (R. at 2755.) She found Slagle was seriously limited in her ability to deal with the public; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex job instructions; and to behave in an emotionally stable manner. (R. at 2754-55.)  Dr. Burns opined Slagle would be absent from work about one day a month. (R. at 2756.)

That same day, Dr. Burns completed a medical assessment, finding Slagle could occasionally lift and carry items weighing five pounds and three pounds frequently; she could stand and/or walk up to two hours in an eight-hour workday and could do so for 10 minutes without interruption; she could sit up to four hours in an eight-hour workday and could do so for 30 minutes without interruption; she could occasionally balance and crawl and never climb, stoop, kneel or crawl; she was restricted from working around heights, moving machinery, temperature extremes, chemicals, dust, fumes and humidity; and she would be absent from work about one day a month. (R. at 2757-59.)

On July 13, 2020, Burke completed a mental assessment, finding Slagle had moderate limitations, resulting in a satisfactory ability to follow work rules; to use judgment in public; to function independently; to understand, remember and carry out simple and detailed job instructions; to maintain personal appearance; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability.  (R. at 2819-21.) She opined Slagle had serious limitations, resulting in an unsatisfactory work performance, in her ability to relate to co-workers; to deal with the public; to interact with supervisors; to deal with work stresses; to maintain attention and concentration; and to understand, remember and carry out complex job instructions. (R. at 2819-20.) Burke found that Slagle would be absent from work more than two days a month due to her impairments. (R. at 2821.)

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2021). *See also Heckler v. Campbell,* 461 U.S. 458, 460-62 (1983); *Hall v. Harris,* 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a

severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a)(4) (2021).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers,* 131 F.3d 438, 439-40 (4th Cir. 1997).

Slagle argues the ALJ failed to properly evaluate her obesity throughout the sequential evaluation process. (Plaintiff's Memorandum In Support Of Her Motion

For Summary Judgment, ("Plaintiff's Brief"), at 6-7.) Slagle further argues the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of Barnett, Dr. Moore, Stair, Dr. Burns and Burke. (Plaintiff's Brief at 7-9.)

Slagle argues the ALJ failed to properly evaluate her obesity throughout the sequential evaluation process.[17] (Plaintiff's Brief at 6-7.) In making a residual functional capacity determination, an ALJ should consider the combined effect of all the claimant's medical impairments. *See* 20 C.F.R. § 416.945(a)(2). The regulations acknowledge that obesity may compound the effects of other impairments.

> Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(Q); *see also* S.S.R. 02-1p, 2002 WL 34686281, at *3 (Sept. 12, 2002).

At step two of the sequential evaluation process, the ALJ determined that Slagle's obesity was a severe impairment because it caused more than a minimal

---

[17] Slagle fails to articulate what further evaluation she believes was warranted based on the record. She also points to no evidence that her obesity resulted in limitations beyond the exertional, postural and environmental restrictions included in the residual functional capacity assessment.

impact on her ability to perform work activities. (R. at 19.) The ALJ then noted at step three that obesity was no longer a listed impairment but recognized that it should be considered at each step of the sequential evaluation process as appropriate and in conjunction with Slagle's other impairments. (R. at 20.) The ALJ explained that he "considered [Slagle's] obesity in relation to the other body systems listings, as required by [] Ruling [S.S.R. 19-2p]." (R. at 20.) However, the ALJ concluded that the medical evidence did not support a finding "that [Slagle's] obesity has reached a level that would cause other impairments to meet or equal a listed impairment." (R. at 20.)

During his residual functional capacity assessment, the ALJ referenced Slagle's testimony from her July 2020 hearing that her "weight caused issues with pain in her bilateral lower extremities," stating it also "made her back pain worse." (R. at 25.)  He also noted that Slagle testified that she could not perform many movements because of her weight. (R. at 25.) In addition, that ALJ noted that, in April 2018, Slagle was trying to become pregnant, had lost weight and was doing well overall. (R. at 28.) At that time, Slagle weighed 270 pounds. (R. at 2206.) In discussing the opinions of the state agency physicians, the ALJ referenced the impact of obesity on Slagle's degenerative disc disease of the lumbar spine and pelvic fractures. (R. at 34.) The ALJ also explicitly stated that he considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" (R. at 23.)

While Dr. Burns noted that Slagle had decreased range of motion and pain in the lumbar back, her examination findings regularly showed her balance, gait and posture were normal; her breathing was effortless and normal and auscultation of the lungs revealed clear breath sounds, bilaterally, with no wheezes or rales; her extremities had normal range of motion with no edema, tenderness or deformity; and

her motor examination revealed normal tone, bulk and strength. Slagle reported she performed various activities, including taking care of her grandparents; running errands; attending a concert; working part-time on a paper route; and changing a tire. Therefore, I find that Slagle's argument that remand is warranted for further evaluation of her obesity is without merit.

Slagle further argues the ALJ erred by improperly determining her residual functional capacity by rejecting the opinions of Barnett, Dr. Moore, Stair, Dr. Burns and Burke. (Plaintiff's Brief at 7-9.) The court notes that Slagle cites no facts from the record, nor does she cite any regulation or case law supporting her claim and she fails to articulate in what way the ALJ erred in evaluating the opinions of these sources. Slagle merely identifies the substance of portions of each opinion and contends the ALJ's residual functional capacity assessment is unsupported.

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. § 416.945(a) (2021). The ALJ found Slagle had the residual functional capacity to perform simple, routine and repetitive light work, except she could lift and carry items weighing 20 pounds occasionally and 10 pounds frequently; stand, walk and sit up to six hours each in an eight-hour workday; push/pull as much as the lift/carry restrictions; occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; never climb ladders ropes or scaffolds; and never work around unprotected heights, hazards and vibration. (R. at 23.) The ALJ also found Slagle was limited to making simple work-related decisions; she was limited to occasional workplace changes for two-hour increments; she could occasionally interact with supervisors and co-workers; and she could never interact with the public. (R. at 23.)

The ALJ considered the opinion of the state agency physician and noted the record showed degenerative disc disease in the lumbar spine, as well as residuals of lumbar and pelvic fractures impacted by obesity. (R. at 34.) In considering the opinion of the state agency physician, the ALJ stated he gave "little great weight" to this opinion. (R. at 34.) However, since the state agency physician found Slagle's impairments were not severe, it is assumed the ALJ gave little weight to the opinion because the ALJ found severe impairments. (R. at 168.)

The ALJ gave the opinions of Dr. Moore and Dr. Burns less weight because they were inconsistent with the record as a whole and appeared to be based on Slagle's subjective complaints. (R. at 34.) The ALJ explained that Slagle's statements regarding the extent of her limitations were inconsistent with the medical records. (R. at 34.) *See* 20 C.F.R. § 416.927(c)(4) (noting that the more consistent an opinion is with the record as a whole, the more weight will be afforded to it). Both Dr. Moore and Dr. Burns found Slagle was limited to less than sedentary work. The ALJ noted that, while there was some evidence of a reduced range of motion, tenderness and spasms in the lumbar spine at times, the medical records do not support consistent multi-joint inflammation, indicated by joint swelling, stiffness, redness and/or warmth. (R. at 34.) He also noted that there was no evidence of reduced grip strength in the hands, loss of color in the allegedly affected regions or muscle atrophy. The ALJ noted the medical record do not contain notes that Slagle exhibited difficulty initiating movement, difficultly moving generally or muscle tremors. (R. at 34.) The ALJ found Slagle did not seek out emergency treatment for asthma or other conditions, and the evidence generally suggested all physical conditions were controlled with medication. (R. at 34.) In addition, the ALJ noted that Slagle recovered well from her fractures. (R. at 34.) The ALJ also noted that, while imaging confirmed degenerative disc disease of the lumbar spine and Slagle reported pain, her medical findings did not significantly change. (R. at 34.)

While Dr. Burns and Dr. Moore noted that Slagle had decreased range of motion and pain in the lumbar back, the record shows her examination findings regularly showed her balance, gait and posture were normal; her breathing was effortless and normal and auscultation of the lungs revealed clear breath sounds, bilaterally, with no wheezes or rales; her extremities had normal range of motion with no edema, tenderness or deformity; and her motor examination revealed normal tone, bulk and strength. X-rays of Slagle's chest, right shoulder and left hip were normal, and she was treated conservatively by way of over-the-counter analgesics, which Slagle reported helped her pain. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In addition, Slagle reported she performed various activities, including taking care of her grandparents; running errands; attending a concert; working part-time on a paper route; and changing a tire.  Again, Slagle fails to point to any record evidence supporting Dr. Moore and Dr. Burns's opinions regarding her physical limitations.

The ALJ also gave the mental assessments of Dr. Moore and Dr. Burns, as well as the opinions of Stair and Burke, little weight. (R. at 34-35.) The ALJ noted that Dr. Moore and Burke opined that Slagle generally had marked and extreme limitations in her ability to perform occupational, performance and personal/social adjustments. (R. at 34.) He found these extreme limitations were inconsistent with the record as a whole, including Slagle's activities during the period at issue, and their findings appeared to be based on Slagle's reports. (R. at 34-35.) Similarly, the ALJ gave the opinions of Barnett, Stair and Burke little weight. (R. at 35.) The ALJ noted that Stair performed a one-time examination and many of the limitations appeared to be based on Slagle's subjective complaints. (R. at 35.) The ALJ further noted that at the time of the examination, Slagle was not taking all of her medications. (R. at 35.) The ALJ noted that, while Slagle appeared anxious or

depressed at times, other providers did not note the same degree of limitations. (R. at 35.) The ALJ noted that, while mood and affect deficits were noted, the remainder of Slagle's mental status examination findings were unremarkable and did not support more than moderate limitations in Slagle's mental work-related abilities. (R. at 35.)

The ALJ gave great weight to the opinions of the state agency psychologists, who found Slagle had mild limitations in her ability to understand, remember and apply information, to concentrate, persist or maintain pace and to adapt or manage herself; and moderate limitations in her ability to interact with others. However, the ALJ found the record supported a moderate limitation in concentration, persistence and pace. (R. at 34.)

While the record shows Slagle had some deficits in mood and affect, the medical evidence routinely showed she had adequate eye contact; her speech was normal; her thought process was intact; she had good to fair insight and judgment; her thoughts were clear and logical; she was goal oriented; she was calm and cooperative; her recent and remote memory were intact; her attention and concentration were good; and she denied paranoia, delusions and suicidal and homicidal ideations. The record shows that, in July 2018,[18] Slagle reported thoughts of cutting herself, but she also reported she was doing better on Latuda. It is noted that throughout 2019 Slagle saw Burke, and reported anger, anxiety and cutting herself, yet she reported to other medical care providers that her symptoms were relatively well controlled on her medication regimen and her providers noted that Slagle made good eye contact; her thought process ranged from normal to

---

[18] It is noted that, in 2018, when Slagle reported difficulty with symptom control, she had discontinued her medications in an attempt to conceive.

conversational; she had partial to full insight and good judgment; she had good impulse control; she was fully oriented; her attention and concentration were adequate; she had no memory impairment; and her mood, affect and behavior were normal, and at times, her mood was described as calm, anxious and depressed.

As discussed throughout the ALJ's decision, Slagle engaged in a range of activities, including taking care of her grandparents; running errands; attending a concert; working part-time on a paper route; and changing a tire. She reported she was "very busy" with her mother and grandmother, who were experiencing medical issues, and therefore, she was "too busy" to find another psychiatrist for herself. Slagle reported that her moods were stable on her medication regimen. *See Gross,* 785 F.2d at 1166.

While Slagle often complained of stress, the ALJ found she could perform simple, routine and repetitive light work that required her to make no more than simple work-related decisions; she required occasional workplace changes for two-hour increments; she could have occasional interaction with supervisors and co-workers; and she could have no interaction with the public. (R. at 23.) The regulations define unskilled work as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a) (2021); *Menkes v. Astrue,* 262 F. App'x 410, 412 (3d Cir. 2008) ("[P]erforming a 'simple routine task' typically involves low stress level work that does not require maintaining sustained concentration."). Unskilled work generally is low stress and involves remembering only very short and simple instructions in a routine environment in which "concentration is not critical." Program Operations Manual System, ("POMS"), DI 25020.010(B)(3), available at http://policy.ssa.gov/poms.nsf/lnx/0425020010 (effective Apr. 5, 2007) (explaining

that unskilled work involves "remember[ing] very short and simple instructions," and that "concentration is not critical").

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his residual functional capacity finding. An appropriate Order and Judgment will be entered.

DATED:     September 30, 2022.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE